**D. Robert AUTREY, Jr., an individual, et al., Plaintiffs-Appellees, Cross-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellant Cross-Appellee.**

No. 87–8916.

United States Court of Appeals, Eleventh Circuit.

Dec. 6, 1989.

Gary R. Allen, Acting Chief, Appellate Section, Tax Div., Dept. of Justice, William S. Rose, Jr., Asst. Attorney General, Jonathan S. Cohen, Joan I. Oppenheimer, Asst. Attys. Gen., Washington, D.C., for defendant-appellant, cross-appellee.

Jerry B. Blackstock, Powell, Goldstein, Frazer & Murphy, James W. Hawkins, William M. Ragland, Jr., Atlanta, Ga., for plaintiffs-appellees, cross-appellants.

Before KRAVITCH and CLARK, Circuit Judges, and HENDERSON, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

Appellees-cross-appellants brought suit challenging penalties the Internal Revenue Service had assessed under Internal Revenue Code sections 6700, 6701, and 6694 for promoting abusive tax shelters and aiding and abetting understatement of tax liability.[1] A jury found in favor of appellees and the government appeals, citing as error certain of the district court's jury instructions. Appellees cross-appeal from a decision of the district court that the court lacked jurisdiction to entertain the claim of appellee D. Robert Autrey, Jr. for a refund, as well as the court's decision to deny appellees' motion for litigation costs.

## I.

### A.

### STATEMENT OF FACTS

Autrey is a Georgia lawyer and tax specialist. In the early 1980s Autrey organized four cattle breeding enterprises—Star Brangus Ranch, Inc., Sweet Autumn Land and Cattle Co., Inc., Cattle Enterprises, Ltd., and Circle BA Ranch, Inc. Autrey was the principal promoter of these enterprises, was an officer of each, and played a role in the day-to-day management of each as well.

Autrey promoted the cattle breeding program by means of private placement memoranda offered by each of the four corporations. Although each private placement memorandum on its face purports to offer "securities," a close reading of the memorandum and the evidence adduced at trial reveals that investors were purchasing the actual breeding cows and entering into certain ancillary agreements.[2] Each of the

---

1. This case is governed by the Internal Revenue Code of 1954, as amended, not by the Internal Revenue Code of 1986. All references will be to the Code of 1954 unless otherwise specifically indicated.

2. Use of terms such as "investment," "purchase," "price," "warranty," "interest," "principal," "option," etc., should not be taken as carrying any conclusion as to the legal effect of the documents or transactions involved.

cattle breeding corporations operated in a similar fashion.

The Star Brangus Ranch was characteristic of the cattle breeding investment programs.[3] An investor would enter an agreement as a "Breeder" with Star Brangus, which would act as a "Rancher." A typical investor would make an investment of $100,000, $2,000 of which would be cash and the remaining $98,000 would be in the form of a seven-year recourse promissory note. Under the terms of the promissory note the investor would pay nine percent interest for the first four years, i.e., $8,820, in four equal quarterly installments per year, and would pay off the principal in the fifth, sixth, and seventh years ($57,952, $19,000, and $21,048, respectively).

For his money, the investor purchased a breeding herd or "unit" of six mother cows. As part of his investment, an investor would also enter into a Cattle Breeding Agreement and a Calf Option Agreement. Under the Cattle Breeding Agreement the Rancher would take possession of a Breeder's cows and "furnish the bulls and/or the semen and [would] breed the Breeder's cows in accordance with a planned professional breeding program." The Cattle Breeding Agreement also gave the Breeder the right to have any cow in his herd that became barren replaced with one of equal or greater value. As appellees observe, this right of substitution was essentially a warranty as to the fertility of the cows.

The Breeder/investor was obligated under the Cattle Breeding Agreement to pay the Rancher $1,000 per breeding cow per year for maintenance. This maintenance fee, however, was not scheduled in annual payments; instead, the Breeder would pay $24,000 in the fifth year and $6,000 in the sixth year.

In the first year the Breeder would pay the Rancher an initial management fee of $3,700. Each year the Breeder would also pay the Rancher $720 for cattle insurance, $475 as an annual management fee, and $53 for membership in the Cattle Association.[4]

Under the Calf Option Agreement the investor had a "put" option to sell the calves to the rancher for a fixed price when the calves were two years old. Oddly, the "fixed price" for any calves was not related to the number of calves; it was simply set at $25,000 for a given year's "crop" of calves, regardless of how many calves were sold. The Calf Option Agreement was structured so that the Breeder had to take affirmative steps if he did *not* want to sell a year's calves to the Rancher. If the Breeder took no such steps, the calves would be sold to the Rancher, who would pay for the calves by means of a promissory note. The payments under the promissory note over the course of the agreement were scheduled so that they would largely balance the amounts owed by the Breeder to the Rancher under the breeding cow purchase promissory note.

### Offsetting Promissory Note Payments

| Description | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|---|---|---|---|
| Principal on $98,000 note | | | | | | $57,952 | $19,000 | $21,048 |
| "Maintenance" fees | | | | | | $24,000 | $ 6,000 | |
| Notes (plus accrued interest) under Calf Option Agreement | | | | | | <$81,952> | < 25,000> | <$25,000> |
| Net Cash Amount owed by Breeder to Rancher | | | | | | –0– | –0– | < $3,952> |

The net result of this is that the Breeder would not have to pay off the $98,000 promissory note with cash; instead, that obligation would be satisfied by the Ranch-

---

3. We follow the practice of the parties in using the Star Brangus Ranch memorandum as an example.

4. Including interest on the $98,000 promissory note, the total cash payments from the Breeder to the Rancher would be about $10,000 each year.

er's offsetting obligation under the Calf Option Agreement. We also note that although the Rancher's obligations to the Breeder under the Calf Option Agreement would exceed the Breeder's obligation to the Rancher under the promissory note, this excess would itself be largely offset by the maintenance fee, which, as we noted above, was not due annually, but instead was to be paid in the fifth and sixth years.

It is curious that current maintenance expenses would be paid by promissory notes payable some years from when the Rancher in theory accrued the expenses. Although not necessary to our deciding the appeal at hand, viewed in toto, it appears that the "interest" on the $98,000 promissory note was in large part the actual maintenance fee. The so-called "maintenance fee" promissory notes were simply used to help off-set the principal obligation of the $98,000 promissory note.

If the Breeder decided to retain the calves, or to sell them to someone other than the Rancher, then the Rancher had an option to buy "at least" a one-third breeding interest (and, if applicable, semen interest) in any calf for a fixed price of $2,000 per one-third interest.[5] Further, if the Breeder did not "put" the calves to the Rancher, the Breeder had to reimburse the Rancher for certain maintenance, insurance, and advertising costs associated with the calf. The Breeder would also have to reimburse the Rancher for "Artificial Insemination expenditures," "Sire's semen," etc.[6]

Under the terms of the Cattle Breeding Agreement, in the event of the Rancher's bankruptcy,

the Promissory Note for the original purchase of the cattle, given by the Breeder to the Rancher, shall be null and void as of the time the Rancher is adjudicated a bankrupt. Any Promissory Notes given by the Rancher to the Breeder for the purchase of any calves, and any accrued calf option amounts, under the terms of

the Calf Option Agreement shall be null and void.

By the same token, if the Breeder was declared bankrupt

prior to the Breeder paying all sums due under the terms of the Promissory Note for the original purchase of the cattle, given by the Breeder to the Rancher, the Promissory Note shall be null and void as of the time the Breeder is adjudicated a bankrupt. Any Promissory Notes given by the Rancher to the Breeder for the purchase of any calves, and any accrued calf option amounts, under the terms of the Calf Option Agreement shall be null and void.

Thus, in the event of either party's bankruptcy, the house of cards made from the various promissory notes would conveniently vanish, relieving both parties of liability.

Although the cattle breeding programs were promoted as being profitable, the private placement memorandum, which Autrey authored, and the tax opinion letter he wrote and made a part of the private placement memorandum, detail the lucrative tax benefits an investor might enjoy. We need not go into every facet of the cattle breeding program, the largest tax benefits would flow from the depreciation and investment tax credit Autrey asserted would be available on the full $100,000 investment.

As described by Autrey, under then-applicable law, an investor would take the following Accelerated Cost Reduction System ("ACRS") deductions as well as an Investment Tax Credit ("ITC") over the five-year depreciable life of the cattle (assuming that the $100,000 is properly subject to depreciation):

| Year | ACRS | ITC |
| --- | --- | --- |
| 1 | $14,250 | $10,000 |
| 2 | $20,900 | |
| 3 | $19,950 | |
| 4 | $19,950 | |
| 5 | $19,950 | |

In addition, Autrey asserted that all the various annual expenses—e.g., mainte-

---

5. Arguably, the agreement could be construed to permit the Rancher to purchase three-thirds (i.e., the entire calf) for $6,000.

6. If the Rancher elected to purchase a share of a calf then these costs would be borne pro rata.

nance, association fees, etc.—would also be deductible, as would the interest on the $98,000 promissory note.

## B.

### PROCEDURAL HISTORY

The Internal Revenue Service ("IRS") determined that Autrey's cattle breeding program was an abusive tax shelter.

It appears that the first IRS appraiser valued a herd of six cows at $49,800. Two IRS agents, believing that this appraisal was too high for their purposes, asked the appraiser to change his conclusion. The appraiser refused, and the IRS agents destroyed the appraisal and secured another more to their liking.

On March 11, 1985 the IRS assessed Autrey and the cattle breeding enterprises penalties under section 6700 for promoting abusive tax shelters. Star Brangus was assessed $30,501 with respect to 1982 and $108,988 for 1983. Sweet Autumn Land and Cattle was assessed $43,394 for 1982. Cattle Enterprises was assessed $64,546 for 1982. Circle BA Ranch was assessed $30,029 for 1983. For each assessment against one of the corporations, a duplicate assessment was also made against Autrey individually. Each notice of assessment stated, "THIS IS A DUPLICATE ASSESSMENT AGAINST D. ROBERT AUTREY, JR. AND THIS RELATED CORPORATION, ON THE SAME DATE."

Autrey was also assessed $335,000 under section 6701 for the preparation of material portions of the 1982 and 1983 income tax returns of investors involved in various cattle breeding promotions, and $6,600 under section 6694 for the negligent or intentional disregard of rules and regulations in the preparation of investors' tax returns in 1980 and 1981. In addition, Autrey was assessed $5,000 under section 6700 for the promotion of the Double C Hereford Ranch.

An IRS agent instructed Autrey that only one 15% payment for each "duplicate" assessment would be necessary under section 6703 in order to contest the "duplicate" assessments in the district court.

With checks drawn on his personal checking account, Autrey made one 15% payment for each pair of assessments. In the lower left-hand corner of each check, Autrey referred to the corporation to which the assessment related, e.g., "Sweet Autumn Land & Cattle/IRC6700." The cover letter enclosing each check indicated the taxpayer identification number of both the corporation and Autrey. Also enclosed with each check was a copy of the assessment against the corporation, but not a copy of the "duplicate" assessment against Autrey himself.

The case was tried before a jury. There was conflicting evidence as to the value of the cattle and the ancillary benefits, such as the semen. The government requested the court instruct the jury that in determining whether the appellees had violated section 6700, the jury could only consider the value of the cattle themselves. Instead, the court instructed the jury to consider the value of the "investment unit" as a whole.

Answering special interrogatories, the jury found in favor of the appellees. The government appeals the district court's denial of the government's motion for judgment notwithstanding the verdict or new trial, citing as error the court's jury instruction.

After the trial the government also renewed its argument—which it had made before trial—that the court lacked jurisdiction to entertain Autrey's claim for refund because he had not personally met the jurisdictional requirement of paying 15% of the assessed penalty. The district court concluded that Autrey had not met the statutory requirement, and thus ruled that it lacked jurisdiction to entertain Autrey's individual claim for refund. Autrey cross-appeals the trial court's decision.

Appellees also cross-appeal the district court's conclusion that I.R.C. section 7430 authorized them to recover reasonable litigation costs only for unreasonable conduct on the part of the IRS subsequent to the filing of the taxpayers' refund suit. In addition, appellees also challenge the court's ruling that section 7430 is the exclu-

sive avenue of recovery for litigation costs based on IRS bad faith or unreasonableness.

## II.

## THE GOVERNMENT'S APPEAL

The Government's appeal focuses on the trial court's jury instructions. Whether the jury instructions, taken as a whole, correctly state the law is a question of law of which our review is plenary. *Somer v. Johnson*, 704 F.2d 1473, 1477–78 (11th Cir. 1983).

## A.

We begin with the statutes under which appellees were assessed penalties. The IRS assessed penalties under section 6700, which provides as follows:

**§ 6700. Promoting abusive tax shelters, etc.**

**(a) Imposition of penalty.**—Any person who—

(1) (A) organizes (or assists in the organization of)—

(i) a partnership or other entity,

(ii) any investment plan or arrangement, or

(iii) any other plan or arrangement, or

(B) participates in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes (in connection with such organization or sale)—

(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or

fraudulent as to any material matter, or

(B) a gross valuation overstatement as to any material matter,

shall pay a penalty equal to the greater of $1,000 or 20 percent of the gross income derived or to be derived by such person from such activity.

**(b) Rules relating to penalty for gross valuation overstatements.—**

**(1) Gross valuation overstatement defined.**—For purposes of this section, the term "gross valuation overstatement" means any statement as to the value of any property or services if—

(A) the value so stated exceeds 200 percent of the amount determined to be the correct valuation, and

(B) the value of such property or services is directly related to the amount of any deduction or credit allowable under chapter 1 to any participant.

**(2) Authority to waive.**—The Secretary may waive all or any part of the penalty provided by subsection (a) with respect to any gross valuation overstatement on a showing that there was a reasonable basis for the valuation and that such valuation was made in good faith.

**(c) Penalty in addition to other penalties.**—The penalty imposed by this section shall be in addition to any other penalty provided by law.

Before proceeding further, we should dispose of one of appellees' arguments. Appellees argue—strangely, as a part of their harmless error analysis—that penalties under section 6700 may not be assessed against the corporate appellees.

██ First, we note that the applicable general definition of "person" includes corporations. *See* I.R.C. § 7701.[7] Appellees, however, argue that the penalties under

---

7. Section 7701 provides in relevant part:

**§ 7701. Definitions**

(a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

(1) **Person.**—The term "person" shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation.

As our analysis indicates, the use of this general definition is not "manifestly incompatible" with the intent of section 6700, nor is there any contrary indication in section 6700 itself.

section 6700 cannot be assessed against the allegedly abusive tax shelter itself, only against the promoters of the shelter. Yet as the government points out, the corporations themselves were not the tax shelters, the cows were. The corporations promoted the cattle tax shelter, and thus may properly be assessed penalties under section 6700.

Liability may be imposed under section 6700 on any person who organizes or participates in the sale of a tax shelter for either of two reasons. Under section 6700(a)(2)(A) a penalty is imposed for knowingly making false or fraudulent material representations as to the allowability of any deduction or credit. Under section 6700(a)(2)(B), on the other hand, a penalty is imposed for "a gross valuation overstatement as to any material matter." "Gross valuation overstatement" is defined in section 6700(b)(1)(A) as exceeding 200% of the correct valuation.

At trial the government argued that penalties were properly assessed under either prong of section 6700. The crux of the government's appeal may best be illustrated by considering the second type of liability under section 6700.

1. *Section 6700(a)(2)(B)—Gross Valuation Overstatement.*

In determining whether a person has made a gross valuation overstatement the finder of fact must first know what the subject of the "valuation" is in the first place, i.e., exactly *what* was being valued.

It is undisputed that whatever was being valued, appellees gave "it" a valuation of $100,000. It is also undisputed that, at a minimum, "it" included the six breeding cows. The question is whether "it," for the purposes of valuation, included anything else.

From the private placement memorandum, it would appear that the $100,000 valuation was limited solely to the six breeding cows. The bill of sale is unambiguous on this point:

The Rancher, STAR BRANGUS RANCH, INC., for and in consideration of the sum of One Hundred Thousand ($100,000.00) Dollars, consisting of a down payment in the amount of Two Thousand ($2,000.00) Dollars and a Promissory Note in the amount of Ninety–Eight Thousand ($98,000.00) Dollars, does hereby sell, bargain, convey, transfer and deliver to the Breeder all right, title and interest in and to the Brangus cattle described on Exhibit "BS", hereto annexed and made a part hereto by reference.

From this it would appear that the case is straightforward: was the valuation of the six breeding cows a gross valuation overstatement as that term is defined in section 6700(b)(1)(A)?

Appellees, however, argue that the $100,000 valuation included many things in addition to the breeding cows themselves. For example, during the presentation of appellees' case at trial, Autrey testified as follows:

Q. Can you tell us what you as the drafter of the Bill of Sale and as the—in preparing this document for the cattlebreeding program intended to sell to the investors at the time as a part of the cattlebreeding program?

. . . .

A. They would be buying the cows; they would be buying the management in which to be able to breed these cows to the respective sires that were owned by the ranch; the use of the bull semen that would be the catalyst that would create the calves that would be born of their cows; the maintaining of these cows and calves in a breeding program in which the investor could get a profit; the taking if these calves being managed by our showmen [sic], at that point in time—well, just our showmen [sic] who did nothing but groom the cows, that's the only reason he was on the payroll, was to groom the calves so they could be placed in exhibition in shows. They received the ability to place any of their calves or cows in any of our sales, and we would market those calves and cows for them.

Q. What if a cow turned out to be barren, that is, it would not produce a calf?

A. That's the reason I put the substitute in there. If you have the—the Ranch guaranteed to the investor that they would have viable cows that could be used in a breeding program and they would have a reasonable expectation of receiving calves. If they didn't get any calves ... we would get rid of this particular cow if she was a hard breeder or if for some reason she couldn't be bred at all, because we were going to have to have calves being born. The only way we can make money as a ranch and the only way the investor can make any money as an investor is if calves are born. This is the only way we can do it....

Trial Transcript vol. 2 at 192–94.

Seizing the bull by the horns, as it were, appellees direct our attention to *Houchins v. Commissioner*, 79 T.C. 570 (1982) and *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981). Appellees argue that these cases show that when valuing a tangible asset, the value of associated intangible contract rights must also be included. We agree that *Houchins* and *Grodt* are instructive, but perhaps not in the way appellees would like.

Both *Houchins* and *Grodt* involved investments in cattle breeding tax shelters, and in both, the taxpayers argued that the value of their investment included certain contract rights associated with the cattle themselves. In both cases the Tax Court considered the value of these contract rights, but concluded that these rights were valueless. Although *Houchins* and *Grodt* cannot stand for the proposition that intangible contract rights *must* add value to an associated tangible asset, nevertheless, we find *Houchins* and *Grodt* useful because they illustrate a simple truth: a valueless intangible contract right can add no value to an associated tangible asset.

The items that appellees argue should be included—and which the government argues should *not* be included—fall into two categories. First, appellees argue that the $100,000 valuation included the value of high quality bull semen. Second, the appellees argue that the $100,000 valuation included certain intangibles, such as the right to have a nonbreeding cow replaced.

■ Before considering each of the additional items that appellees assert went into the $100,000 valuation, we note that appellees' good faith belief that an item gave additional value does not suffice under section 6700(a)(2)(B). As quoted above, a statement is a "gross valuation overstatement" if

(A) the value so stated exceeds 200 percent of the amount determined to be the correct valuation, and

(B) the value of such property or services is directly related to the amount of any deduction or credit allowable under chapter 1 to any participant.

I.R.C. § 6700(b)(1). Thus, a promoter is in essence strictly liable for grossly overstating the value of property or services based upon which an investor will attempt to take a deduction or credit. The apparent harshness of this rule is mollified by section 6700(b)(2), which gives the Commissioner the authority to waive the penalty if the promoter acted in good faith.

■ Whether a valuation statement "exceeds 200 percent of the amount determined to be the correct valuation," is a mixed question of law and fact. The actual valuation statement made by a promoter is, of course, a factual issue—in this case it is undisputed to be $100,000. Yet, as we shall discuss, some things—as a matter of law—can add no value, and thus, cannot be a part of the "correct valuation" under section 6700(b).

■ In the context of the instant appeal, the six cows unquestionably have value, and thus the finder of fact must determine their correct valuation. Whether the value, if any, of a warranty, or semen, or management services, tangibles or intangibles, etc., may be included in the valuation is, on the other hand, a question of law. If, as a matter of law, any of those items may add *some* value, then it is within the province of the finder of fact to ascertain their

correct valuation.[8] Where the items have no value, however, it would be improper to instruct the jury to consider the valueless items as that would confuse the jurors and could lead to an illogical and capricious verdict.

### a. Bull Semen

We first address the one additional *tangible* asset that the appellees assert is properly included in the valuation. Before this court appellees assert, as they did below, that in addition to a breeding herd of six cows, an investor purchased "bull semen (a tangible asset) [that] was worth between $20,000 and $23,000." For the reasons discussed below, we conclude that as a matter of law the bull semen could add no value to the investment.

First, we note that appellees appear to overstate the case somewhat by claiming that the investor actually purchased a five-year supply of bull semen as a tangible asset which could be depreciated. There is no record evidence to suggest that the investors actually purchased and took title to any bull semen, frozen in liquid nitrogen, or otherwise.

At the most, an investor actually purchased tangible semen for the first year of the cattle breeding program, and a right to a *future supply* of bull semen in subsequent years. Over the five years of the agreement the investor's cows would be impregnated by this semen. But the investor did not actually purchase a specific existing quantity of semen, nor was the semen itself "identified." Indeed, the donor bull was not even identified.

This clarification, however, is not necessarily dispositive of the question of whether the right to bull semen or actual bull semen itself may properly be included in the valuation. The answer to this question lies in the Calf Option Agreement.

■ As noted above, if a Breeder elected to retain a calf or to sell it to someone other than the Rancher, the Calf Option Agreement specifically required the Breeder to reimburse the Rancher for the cost of the sire's semen and for the costs of insemination. If the Breeder had already purchased the semen as a part of his $100,000 investment, then he could not be required to buy it again later. The simple legal reality of the transaction is that the $100,000 investment cannot have included the actual semen.

■ Even if we posit that the investor purchased an option to buy a future supply of semen, that ersatz option cannot have added any material value to the investment because the price at which the Breeder would have to purchase the semen is, under the Calf Option Agreement, the actual cost. Thus, as a matter of law, the semen could not have added any value to the $100,000 investment.

### b. Other Intangibles

■ Appellees also argue that the investor "purchased" certain other intangible contractual rights, and that the value of these additional rights should be included in the valuation. We note that at this point we are not considering whether these intangibles are properly subject to the ITC and ACRS; instead, we are focusing solely on their economic value absent ITC and ACRS. Yet here again, because the contractual terms of those intangible rights required the investor (as Breeder) to pay for any benefits such as management services, the asserted additional value of these rights is chimerical.

For example, as the excerpt of Autrey's testimony quoted above shows, appellees assert that the management and maintenance services the Rancher was obligated to provide under the Cattle Breeding Agreement added value to the investment. Yet, as noted above, the Cattle Breeding Agreement specifically required the Breeder to compensate the Rancher for those

---

8. Judge Clark's assertion that valuation is usually a matter for the jury does not undermine our conclusion, which is that a jury should not be permitted to increase a valuation determination based on a valueless "intangible right." *Laird v.* *United States,* 556 F.2d 1224 (5th Cir.1977), is in no way contrary as there the intangible rights *were* valuable. Moreover, *Laird* was tried to the court as a finder of fact.

very same services, such as feed and veterinary care.[9]

Before turning to the right of substitution, it is useful to consider where our analysis has brought us so far. As noted above, the private placement memorandum—in particular the bill of sale and promissory note, the Cattle Breeding Agreement, and the Calf Option Agreement—suggests that the $100,000 was solely for the purchase of the breeding cows. At trial, however, appellees in essence argued that the documents did not mean what they said, and that the investor was actually purchasing much more. Yet by making such arguments, the appellees ignored the inescapable legal consequences of the complex web of contractual arrangements that appellees drafted and entered into. By giving full legal effect to the agreements, we have returned to the point from which we began: the private placement memorandum meant what it said.

c. Right of Substitution

 Whether the right of substitution—essentially a warranty as to the fertility of the cows—may add value to the investment is a slightly different issue. At trial the appellees argued that the market value of the six breeding cows did not include the value of this warranty, and that the warranty itself thus added additional value.[10]

9. Judge Clark, in dissent, argues that because the *rancher* had the right to place the investor's cattle in shows with the possible result of increasing the value of that particular animal and its progenitors, therefore the investor received something of value which he did not pay for separately. Judge Clark's analysis and view of the record are inaccurate. First, analytically, the fact that the *rancher* unilaterally could decide to place or not to place calves (Autrey's testimony and the underlying documents refer to calves being shown) in shows provided no bargained for benefit purchased by the investor. The investor did not purchase a right to have his or her calves shown, nor did the investor purchase a right to have other Star Brangus calves shown (in hopes that the success of others would have a salubrious effect on the value of his own investment). That the rancher did show calves and that the promotion may have improved the value of the investor's calves is immaterial to those intangible rights *purchased* by the investor. Assuming arguendo, however, that the parties understood the rancher's obligation to provide "a professional breeding program" to encompass an obligation to show the animals, nonetheless, the investors paid the expenses *in addition to the initial investment.*

Autrey testified "We also had included in the program the right to have their calves shown at no further cost to them other than the actual expense of being on the road." In fact, however, the Calf Option Agreement provides that if the investor decides to retain ownership of a calf (i.e., decides to override the rancher's automatic ownership option), then "the Breeder [investor] will reimburse the Rancher for ...

(b) advertising of any specific calf; and

(c) Show/Exhibition expenditures, including, but not limited only hereto ... registration, travel, grooming and the like, prorated for any specific calf." (second ellipsis in original).

The agreement provided that there were "no agreements, representations, or warranties, either expressed or implied, oral or written, other than those expressly herein set forth." Autrey's testimony to the contrary cannot defeat the provisions of the agreement.

Therefore, as with the the management and maintenance fees, to the extent the investors elected to reap any of the real economic benefits of the show awards, the investors were required to pay their own way. Otherwise, the rancher automatically owned the calf, decided whether or not to show it, and received any of the concomitant benefits. The economic reality exhibited here is the same as that permeating the entire deal: the investor owned the cattle, and all additional maintenance or investment-enhancing services were provided on a pay-as-you-go basis.

Finally, even if the investors did not bear the costs, it is far from clear that the appraised value of the cattle would not already include the increased value resulting from the results of exhibition showings. We need not reach that issue, however, given the facts of this case.

10. We note the Tax Court has observed that in the cattle breeding business such warranties are customary, and are included in the market price of the breeding cows. *See Houchins v. Commissioner,* 79 T.C. 570 (1982); *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1239 (1981) ("since the standard practice in the industry when selling breeding cattle is to include a nonbreeder warranty, that warranty adds nothing to the established fair market value of [the] cattle"). The Tax Court's observation, not dispositive of the case at hand, illustrates an important point. It is often difficult to ascertain the value of an intangible asset such as a warranty, and courts must be alert to prevent the possibility of double-counting. If the appellees argue that the warranty has a separate ascertainable value, then the appellees must show first that the value of the warranty is not already reflected in the market value of the cattle. The appellees must then prove the *additional* value of the warranty.

Even assuming *arguendo* that the market value of the cows does not reflect the warranty, the benefit of the warranty ran to the Rancher. As noted above, the Calf Option Agreement obligated the Rancher to purchase each year's "crop" of calves. As we also noted, the Rancher's purchase price was not based on the number of calves. For example, if the six cows produced a "crop" of six calves, the Rancher would pay the Breeder $25,000 (through a promissory note). Similarly, if the six cows produced a "crop" of only one calf, the Rancher would still be obligated to pay the same $25,000. Thus, the risk of fertility was essentially shifted to the Rancher. The Breeder would have no incentive to pay more for a warranty when he would not suffer the ill-consequences of nonfertility. Therefore, given the effect of the Calf Option Agreement, the warranty adds no significant value to the investment.[11]

### d. Jury Instructions on Section 6700(a)(2)(B)

With these observations in mind, we turn to the jury instructions given by the trial court. The government specifically requested that the court instruct the jury it could only consider the valuation of the cows themselves. The court, however, in-structed the jury to consider the value of the "investment unit." Because we have concluded that, as a matter of law, only the cattle could be considered in determining the "correct valuation," the court's jury instruction was in error, and the government's requested charge, insofar as it was limited to the cattle value, was correct.[12]

Autrey's actual cost of the breeding cows the investor purchased was about $24,096 per unit of six cows. The trial testimony as to the value of the cows ranged from $14,922 to $92,700 per herd. Because there was ample evidence to support a jury finding that $100,000 was a gross valuation overstatement, the error in the jury instruction was not harmless.

### 2. Section 6700(a)(2)(A)—False Representations.

We turn next to the government's alternative theory of liability under section 6700.[13] Section 6700(a)(2)(A) imposes a penalty on a person who makes "a statement with respect to the allowability of any deduction or credit ... which the person knows or has reason to know is false or fraudulent as to any material matter." By its terms, section 6700(a)(2)(A) does not impose a strict liability; instead, the section

---

11. Judge Clark asserts that evidence was presented at trial demonstrating that the right of substitution resulted in an increase in the value of the investor's "unit" of six cows, and that a reasonable jury could have so found. As with the showing "rights," the issue here is not whether some investors in fact received better and younger cows as the result of substitution; the issue is whether each investor purchased the right to such a substitution. In fact, the agreement provided that the rancher was obliged to substitute a cow of "equal or greater quality." Judge Clark's assumption that the substitute cows always would be younger is unfounded. Admittedly, the substitute cow did have to be fertile and of at least *equal* quality. The substitution provision required no more than equal value replacement, and accordingly we believe no additional value was guaranteed the investor by the substitution agreement.

12. Thus, we agree with Judge Clark on the legal standard to be applied on appeal in evaluating a party's allegation of error as to jury charges, but because of our differing views on the merits of valuation we conclude that the government has placed the issue before us properly. We need not expressly approve the letter of the government's proffered instruction, but we do conclude that it was sufficient to alert the trial judge to the gist of the government's contention. Under the law, as we have set forth above, the instruction as given could have misled the jury and adversely affected its understanding of the issues.

13. Before proceeding any further, it may be useful to put our discussion in perspective. As this appeal illustrates, § 6700(a)(2)(A) and (B) stand as Scylla and Charybdis, traps to the left and to the right for the promoter of an abusive tax shelter. On the one side, appellees face the risk of § 6700(a)(2)(B) of gross valuation overstatement as to the $100,000 investment. To avoid this, appellees argued that the $100,000 investment included additional intangible rights. Yet in trying to avoid § 6700(a)(2)(B), appellees risk falling into the whirlpool of § 6700(a)(2)(A). If those alleged intangible rights were included in the investment, but if they are *not* subject to the ITC and ACRS, then appellees have made a false statement under § 6700(a)(2)(A), and will be liable if they knew or had reason to know that it was false.

requires that a person must "know or have reason to know" that a statement as to the allowability of a deduction or credit is "false or fraudulent."

### a. The Statement

The first step under section 6700(a)(2)(A) is to determine the "statement with respect to the allowability of any deduction or credit" made by appellees. Appellees assert that this statement was that ACRS and ITC would be available on both the tangible and intangible property that made up the cattle breeding program investment. Even taking appellees at their word, however, does not help their case.

### b. False or Fraudulent

The next step is to determine whether that statement was "false or fraudulent." There is no dispute that the six cows are properly subject to the ITC and ACRS. Thus, we must turn to the question of whether appellees' statement on the availability of the ACRS and ITC on the other tangible and intangible assets was "false or fraudulent."

We first turn to appellees' statement that the ACRS and ITC are available for intangible assets. Appellees have cited no authority for this proposition. Internal Revenue Code sections 38(a)(2) and 46(a)

allowed for a tax credit of a percentage of the cost of a "qualified investment." Under the section 46(c) definition, a "qualified investment" could only be "section 38 property." [14] The final piece to our puzzle is to be found in section 48(a), which limited the definition of "section 38 property" to certain *tangible* property.[15] Therefore, based on the Code, the ITC was available only on tangible property.

Similarly, the availability of the ACRS was also specifically linked to tangible property. Under section 168(a), depreciation under the ACRS was available only for "recovery property." [16] Section 168(c) in turn defined recovery property as *tangible* property.[17] Thus, the ACRS was also available only for tangible property.[18]

Appellees argue that *Texas Instruments, Inc. v. United States*, 551 F.2d 599 (5th Cir.1977) supports their assertion that intangible property can be "bundled" with tangible property, and the value of both can be subject to the ACRS and the ITC. First, we note that in *Texas Instruments* the issue before the court was not whether tangible or intangible assets are subject to the investment tax credit, or whether they could be bundled together. Instead, the issue was whether the value of the tangible assets—computer data tapes—included the cost basis of the collection of the seismic data stored on the tapes. The court ex-

---

**14.** Section 46(c) provided in part:

(c) Qualified investment.—

(c)(1) In general.—For purposes of this subpart, the term "qualified investment" means, with respect to any taxable year, the aggregate of—

(c)(1)(A) the applicable percentage of the basis of each new section 38 property (as defined in section 48(b)) placed in service by the taxpayer during such taxable year, plus

(c)(1)(B) the applicable percentage of the cost of each used section 38 property (as defined in section 48(c)(1)) placed in service by the taxpayer during such taxable year.

**15.** Section 48 read in part:

§ 48. Definition; special rules

(a) Section 38 property.—

(a)(1) In general.—Except as provided in this subsection, the term "section 38 property" means—

(a)(1)(A) tangible personal property (other than an air conditioning or heating unit), or

(a)(1)(B) other tangible property (not including a building and its structural components) ...

**16.** Section 168(a) provided:

§ 168. Accelerated cost recovery system

(a) Allowance of deduction.—There shall be allowed as a deduction for any taxable year the amount determined under this section with respect to recovery property.

**17.** Section 168(c) provided in part:

§ 168(c) Recovery property.—For purposes of this title—

(c)(1) Recovery property defined.—Except as provided in subsection (e), the term "recovery property" means tangible property of a character subject to the allowance for depreciation—

(c)(1)(A) used in a trade or business, or

(c)(1)(B) held for the production of income.

**18.** By contrast, under § 167 of the Code, certain intangibles could be depreciated. *See* Reg. 1.167(a)–3.

pressly concluded that the property at issue—tapes with certain seismic data—*was in fact tangible.* 551 F.2d at 611 ("Thus, the basis of the tangible tapes and films must include the costs of collecting ... seismic data and recording it on the tangible property, with the result being an asset constituting 'tangible personal property.' ").

Appellees' argument based on *Texas Instruments* may be reduced to the following syllogism: (1) Seismic data is intangible. (2) The value of seismic data is included in the tangible asset data tape. (3) Therefore, the value of intangibles may be included in the value of tangibles. Appellees ignore the essential facts that led the *Texas Instruments* court to its conclusion.

*Texas Instruments* does not suggest that intangible assets are themselves subject to the ITC or ACRS. Moreover, *Texas Instruments* does not hold that the value of an intangible contract right may be "bundled" with a related tangible asset. Instead, *Texas Instruments* teaches that tangible property that is the physical incarnation of an intangible may include the cost basis of collecting or creating that intangible.[19] "[The tapes] have intrinsic value because the seismic information thereon does not exist as property separate from the physical manifestation." *Id.* Thus, in *Texas Instruments* itself, the depreciable cost of data tapes and films containing seismic data included the cost of obtaining that data. Similarly, the basis of a motion picture film may include the cost of "creating" the film. *E.g., Walt Disney Productions v. United States,* 549 F.2d 576 (9th Cir.1976).

Appellees' cattle breeding program is entirely different. Although the alleged intangible assets—contract rights—*relate to* the tangible cows, that does not mean that they have no existence other than through the tangible assets. Indeed, any intangible contract right may be thought of as relating to some tangible asset. Appellees' reasoning would swallow up all intangible assets into heretofore unknown "bundles." The simple truth is that the intangibles here are contract rights, which are not tangible. *Laird v. United States,* 556 F.2d 1224 (5th Cir.1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1972). As we noted above, intangibles are not subject to the ITC or ACRS.

■ Appellees have failed to suggest how the intangible rights involved in the cattle breeding tax shelter would fit under the rule of *Texas Instruments,* and they have also utterly failed to show how the intangible contract rights involved are any different from all other contract rights, which are not subject to the ITC or ACRS, a point on which the law has long been settled. By no stretch of the imagination can we fit appellees' cattle breeding program within *Texas Instruments.*[20]

■ Thus, we conclude that as a matter of law, appellees' statements as to the allowability of the ACRS and ITC with respect to the intangible aspects of the cattle breeding program were false. We also observe that these statements were unquestionably "material."

c. "Knows or has reason to know"

The next step under section 6700(a)(2)(A) is to determine whether the appellees "knew or had reason to know" that their false statement as to the allowability of the ITC and ACRS for the intangible aspects of

**19.** Revenue Ruling 71–177. 1971–1 C.B. 5, is fully consistent with this. Computer software is simply another form of "data," and thus is akin to the seismic data in *Texas Instruments.*

**20.** In their brief before this court, the appellees claim that "[t]he Government's failure to cite *Texas Instruments* as controlling authority contrary to its position is at best disingenuous and comes close to a violation of ethical rules or Fed.R.Civ.P. 11." Because we find that *Texas Instruments* was in no way contrary to the Government's position, we of course find no reason to impugn the Government's conduct.

We will take this opportunity, however, to warn appellees' counsel that we look with disfavor on a party's use of Rule 11 or the ethical rules as combative tools. The rules governing the ethical conduct of lawyers are far too important to be trivialized and used in baseless mudslinging such as this. We will not tolerate attempts to use the ethical rules in a way contrary to the spirit of those very rules.

the cattle breeding program was false. This is a determination for the finder of fact on remand.[21]

3. On remand

On remand, the court must instruct the jury under sections 6700(a)(2)(A) and (B) along the lines of our analysis above.

The first step is to determine the statement made as to the allowability of a deduction or credit. If the jury concludes that, as appellees assert, the statement was that the $100,000 investment included the value of the cows *and* the ancillary intangible contract rights, and that all would be properly subject to the ITC and ACRS, the court must instruct the jury that the statement as to the allowability of the ACRS and ITC for the intangible aspects of the investment was false for the purposes of section 6700(a)(2)(A). Furthermore, the court must instruct the jury that in determining the "correct valuation" under section 6700(a)(2)(B), the sole item to be valued is the cattle themselves.

### B.

The IRS also assessed penalties under section 6701, which provides in part:

**§ 6701. Penalties for aiding and abetting understatement of tax liability**

**(a) Imposition of penalty.**—Any person—

(1) who aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return, affidavit, claim, or other document in connection with any matter arising under the internal revenue laws,

(2) who knows that such portion will be used in connection with any material matter arising under the internal revenue laws, and

(3) who knows that such portion (if so used) will result in an understatement of the liability for tax of another person,

shall pay a penalty with respect to each such document in the amount determined under subsection (b).

**(b) Amount of penalty.**—

(1) **In general.**—Except as provided in paragraph (2), the amount of the penalty imposed by subsection (a) shall be $1,000.

(2) **Corporations.**—If the return, affidavit, claim, or other document relates to the tax liability of a corporation, the amount of the penalty imposed by subsection (a) shall be $10,000.

(3) **Only 1 penalty per person per period.**—If any person is subject to a penalty under subsection (a) with respect to any document relating to any taxpayer for any taxable period (or where there is no taxable period, any taxable event), such person shall not be subject to a penalty under subsection (a) with respect to any other document relating to such taxpayer for such taxable period (or event).

. . . .

**(f) Penalty in addition to other penalties.**—

(1) **In general.**—Except as provided by paragraph (2), the penalty imposed by this section shall be in addition to any other penalty provided by law.

(2) **Coordination with return preparer penalties.**—No penalty shall be assessed under subsection (a) or (b) of section 6694 on any person with respect to any document for which a penalty is assessed on such person under subsection (a).

The jury's determination of appellees' liability under section 6701 was necessarily related to its determination under section 6700. Yet, as we have concluded, the jury's findings with regard to section 6700 were based on erroneous instructions. Therefore, the findings under section 6701

---

21. Nevertheless, we should note that just because we have taken the time to dispose of appellees' "bundling" argument, this should not be taken as any indication that we believe the argument itself is reasonable, or that Autrey was under such a belief at the time he made the statement at issue. Indeed, we can only reiterate that appellees' reliance on *Texas Instruments* is wholly inapposite, and there is no support for their claim that any intangible contract right may be "bundled" with tangible assets to which they may relate.

as well as the jury's findings with regard to section 6694 must be set aside.[22]

## III.

### THE TAXPAYERS' CROSS-APPEAL

#### 1. Jurisdiction

The appellees cross-appeal the trial court's determination that it lacked jurisdiction to entertain Autrey's individual claims for refund because he had not met the statutory requirements for seeking a refund in the district court.

Under section 6703, a person seeking to challenge in the district court the assessment of a penalty under section 6700 or 6701 must pay 15% of the assessed penalty:

**§ 6703. Rules applicable to penalties under sections 6700, 6701, and 6702**

(a) **Burden of proof.**—In any proceeding involving the issue of whether or not any person is liable for a penalty under section 6700, 6701, or 6702, the burden of proof with respect to such issue shall be on the Secretary.

(b) **Deficiency procedures not to apply.**—Subchapter B of chapter 63 (relating to deficiency procedures) shall not apply with respect to the assessment or collection of the penalties provided by sections 6700, 6701, and 6702.

(c) **Extension of period of collection where person pays 15 percent of penalty.**—

(1) **In general.**—If, within 30 days after the day on which notice and demand of any penalty under section 6700, 6701, or 6702 is made against any person, such person pays an amount which is not less than 15 percent of the amount of such penalty and files a claim for refund of the amount so paid, no levy or proceeding in court for the collection of the remainder of such penalty shall be made, begun, or prosecuted until the final resolution of a proceeding begun as provided in paragraph (2).

Notwithstanding the provisions of section 7421(a), the beginning of such proceeding or levy during the time such prohibition is in force may be enjoined by a proceeding in the proper court.

(2) **Person must bring suit in district court to determine his liability for penalty.**—If, within 30 days after the day on which his claim for refund of any partial payment of any penalty under section 6700, 6701, or 6702 is denied (or, if earlier, within 30 days after the expiration of 6 months after the day on which he filed the claim for refund), the person fails to begin a proceeding in the appropriate United States district court for the determination of his liability for such penalty, paragraph (1) shall cease to apply with respect to such penalty, effective on the day following the close of the applicable 30-day period referred to in this paragraph.

 The code refers to a 15% payment by "any person" on whom notice and demand are made. The "duplicate assessments" were made against both Autrey and the corporate entities, all of whom are "persons" for this purpose. Accordingly each entity was required by the statute to pay 15% of the penalty in order to preserve the district court's jurisdiction.

22. Section 6694 provides in part as follows:

**§ 6694. Understatement of taxpayer's liability by income tax return preparer**

(a) **Negligent or intentional disregard of rules and regulations.**—If any part of any understatement of liability with respect to any return or claim for refund is due to the negligent or intentional disregard of rules and regulations by any person who is an income tax return preparer with respect to such return or claim, such person shall pay a penalty of $100 with respect to such return or claim.

(b) **Willful understatement of liability.**—If any part of any understatement of liability with respect to any return or claim for refund is due to a willful attempt in any manner to understate the liability for a tax by a person who is an income tax return preparer with respect to such return or claim, such person shall pay a penalty of $500 with respect to such return or claim. With respect to any return or claim, the amount of the penalty payable by any person by reason of this subsection shall be reduced by the amount of the penalty paid by such person by reason of subsection (a).

The inescapable fact is that for each "duplicate assessment" only one 15% payment was made. The district court concluded that, based on the evidence, the payment was not made by Autrey in his individual capacity, but instead was made by the corporations. We cannot say that this was error.

 Autrey argues that because an IRS agent told him that only one payment was required for each "duplicate assessment" the government should somehow be estopped from asserting lack of jurisdiction. It is too late in the day to argue that estoppel may confer jurisdiction on a court of limited jurisdiction, be those limitations based on constitutional or statutory grounds.

Autrey also argues that the issuance of "duplicate" assessments is itself not authorized by the Code. By making this argument, however, Autrey fails to grasp that the district court lacked jurisdiction to entertain such a challenge to the validity of the assessment. As the district court so succinctly noted, Autrey "may not by-pass the jurisdictional prerequisite by attacking the validity of the assessment."

## 2. Litigation costs

Appellees also cross-appeal from the district court order denying their motion for litigation costs. Under section 7430, a prevailing party may recover reasonable litigation costs if "the position of the United States in the civil proceedings was unreasonable."[23] Under prior binding precedent of this court, the "position" of which the reasonableness must be judged is solely that taken in the civil litigation, and does not include prior administrative positions or conduct. *Ewing v. Heye*, 803 F.2d 613 (11th Cir.1986). The district court concluded that the government's position during litigation was reasonable, a conclusion that our analysis supports. Because we have vacated and reversed the judgment in favor of appellees, however, appellees are no

---

**23.** Section 7430 provides in relevant part:

**§ 7430. Awarding of court costs and certain fees**

(a) **In general.**—In the case of any civil proceeding which is—

(1) brought by or against the United States in connection with the determination, collection, or refund of any tax, interest, or penalty under this title, and

(2) brought in a court of the United States (including the Tax Court and the United States Claims Court),

the prevailing party may be awarded a judgment for reasonable litigation costs incurred in such proceeding.

(b) Limitations.—

(b)(1) Maximum dollar amount.—The amount of reasonable litigation costs which may be awarded under subsection (a) with respect to any prevailing party in any civil proceeding shall not exceed $25,000.

(b)(2) Requirement that administrative remedies be exhausted.—A judgment for reasonable litigation costs shall not be awarded under subsection (a) unless the court determines that the prevailing party has exhausted the administrative remedies available to such party within the Internal Revenue Service.

(b)(3) Only costs allocable to the United States.—An award under subsection (a) shall be made only for reasonable litigation costs which are allocable to the United States and not to any other party to the action or proceeding.

(b)(4) Exclusion of declaratory judgment proceedings.—

(b)(4)(A) In general.—No award for reasonable litigation costs may be made under subsection (a) with respect to any declaratory judgment proceeding.

(b)(4)(B) Exception for section 501(c)(3) determination revocation proceedings.—Subparagraph (A) shall not apply to any proceeding which involves the revocation of a determination that the organization is described in section 501(c)(3).

....

(c) Definitions.—For purposes of this section—

(2) Prevailing party.—

(A) In general.—The term "prevailing party" means any party to any proceeding described in subsection (a) (other than the United States or any creditor of the taxpayer involved) which—

(i) establishes that the position of the United States in the civil proceeding was unreasonable, and

(ii)(I) has substantially prevailed with respect to the amount in controversy, or

(II) has substantially prevailed with respect to the most significant issue or set of issues presented.

(B) Determination as to prevailing party.—Any determination under subparagraph (A) as to whether a party is a prevailing party shall be made—

(i) by the court, or

(ii) by agreement of the parties.

longer the "prevailing party." Thus, any issue of fees under section 7430 is not properly before this court. Nor need we reach appellees-cross-appellants' argument in the alternative that they may recover fees under 28 U.S.C. § 2412.

## IV.

### CONCLUSION

We conclude with an admonitory note. In this opinion we have not sought to chart the course for some future promoter of cattle breeding as a tax shelter. Rather, we have simply decided the case at hand. As this case so well illustrates, the promoter of a tax shelter who tries to avoid the mistakes made by others may unwittingly fall into new ones of his own making. And that is how it should be.

Discussing another provision of the Internal Revenue Code aimed at curbing abuse, Judge Raum observed that "Congress was obviously fed up with widespread abusive practices." *Hans S. Mannheimer Charitable Trust v. Commissioner*, 93 T.C. 35 (1989). We believe the section 6700 and 6701 penalties reflect a similar congressional intolerance of grossly abusive practices.

AFFIRMED IN PART, REVERSED IN PART and REMANDED WITH INSTRUCTIONS.

CLARK, Circuit Judge, concurring in part and dissenting in part:

The majority's analysis of this complex case is seemingly logical, but incomplete. There is no doubt that the investment programs created by Mr. Autrey offered incredible tax benefits to investors based on a small cash outlay. The programs arguably contain several of the classic elements of the very types of abusive tax shelters Congress intended to discourage by assessing civil penalties against promoters under section 6700. The abusive nature of these programs was extensively debated before the jury in a trial that lasted thirteen days. Arguments that the programs lacked economic substance, that they were not intend-

ed to make a profit, and that Mr. Autrey knowingly misrepresented the tax laws were presented by the government and challenged by Mr. Autrey. In the end, the jury believed Mr. Autrey, and found that the plaintiffs were entitled to a refund of their prepayments of the penalties. In its analysis of the government's appeal, the majority disregards the jury's verdict and ignores precedent that does not allow for reversal on grounds that were not raised in the district court. Because I find that the verdict is supported by the evidence and is not manifestly inconsistent with the law, I cannot join in the majority's decision to allow the government to re-try this case on new theories of liability.

Although from the very beginning the focus of this case has been on Mr. Autrey, the majority finds that the district court correctly held that the jury's verdict in favor of Mr. Autrey with respect to the four "duplicate assessments" in this case was invalid. On this issue the majority ignores ramifications of its decision that are clearly inconsistent with the law. I therefore respectfully dissent.

I concur in the result reached by the majority with respect to the plaintiffs' claims for litigation costs under section 7430. I write separately to explain that although this Circuit's recent decision in *Ewing v. Heye* controls this case, the future validity of that decision is limited by a subsequent amendment to section 7430.

### I. Background

In this case the government appeals from a jury verdict in favor of the plaintiffs, D. Robert Autrey, Jr., an individual, and Star Brangus Ranch, Inc., Sweet Autumn Land and Cattle Co., Inc., Cattle Enterprises, Ltd. and Circle BA Ranch, Inc. (the "corporate plaintiffs"). Mr. Autrey owns 50% of the stock of Cattle Enterprises, Ltd., and 100% of the stock of the other three corporate plaintiffs. In March of 1985 the IRS sent letters to the plaintiffs notifying them of assessments for penalties under three different sections of the

Internal Revenue Code.[1] Under section 6700, the IRS made penalty assessments with respect to five distinct investment plans. "Duplicate assessments" were made with respect to four plans involving the four corporate plaintiffs. Based on the activities of each corporate plaintiff, the IRS sent two assessment notices, one to the corporation and one to Mr. Autrey. The notices addressed to Mr. Autrey made reference to the relevant corporation, indicated an assessment amount, and contained a legend at the bottom which stated: "THIS IS A DUPLICATE ASSESSMENT MADE AGAINST D ROBERT AUTREY, JR. AND [the relevant corporation], ON THE SAME DATE." The notices addressed to each corporation made reference to Mr. Autrey, indicated an identical assessment amount to that shown on the corresponding notice to Mr. Autrey, and contained a legend at the bottom that stated: "THIS IS A DUPLICATE ASSESSMENT MADE AGAINST D ROBERT AUTREY, JR. AND THIS RELATED CORPORATION, ON THE SAME DATE." Notice of the fifth assessment under section 6700 was sent only to Mr. Autrey, was not marked as a "duplicate assessment", and was apparently related to Mr. Autrey's activities with respect to another corporation, Double C Hereford Ranch. The IRS also made three assessments under sections 6701 and 6694 against Mr. Autrey individually. Mr. Autrey received three notices relating to these assessments, one for a $335,000 assessment under section 6701, and two for assessments of $5,400 and $1,200 under section 6694.

Section 6703 provides that persons assessed penalties under sections 6700 and 6701 may delay the collection of the penalty by the IRS by paying 15% of the assessed amount and filing a claim for refund with the IRS. If the claim for refund is denied, the alleged violator may bring an action for refund in federal district court. I.R.C. § 6703(c). Section 6694 sets out identical procedures for contesting an assessment under that section. I.R.C. § 6694(c). After having been told by an IRS agent that only one 15% prepayment was necessary for the plaintiffs to contest a "duplicate assessment", Mr. Autrey sent five checks to the IRS, each in an amount corresponding to 15% of the assessment under section 6700 indicated on each notice. Mr. Autrey also sent three separate checks in amounts corresponding to the assessments made against him individually under sections 6701 and 6694.

Mr. Autrey and the corporate plaintiffs made the appropriate claims for refund, which the IRS denied. Mr. Autrey and the corporate plaintiffs then timely filed an action for refund in the district court, and after a lengthy trial the jury found in favor of the plaintiffs on all of the assessments. After the verdict, the government made a motion for a judgment notwithstanding the verdict, in which it renewed its argument that the district court did not have jurisdiction to entertain Mr. Autrey's claim for refund with respect to the four "duplicate assessments". Specifically, the government argued that because only one 15% prepayment had been made for each of those assessments, and those prepayments had been credited to the corporations, Mr. Autrey had not met the jurisdictional prerequisite of section 6703. The district court agreed with the government that the verdict with respect to the four "duplicate assessments" against Mr. Autrey was invalid. Consequently, the court vacated the portion of its judgment in favor of Mr. Autrey on his claims for refund of amounts assessed against him under section 6700 in the four "duplicate assessments", and dismissed those claims without prejudice for lack of subject matter jurisdiction. However, the court denied the government's motion with respect to all other issues, thus upholding its judgment in favor of the corporate plaintiffs with respect to the "duplicate assessments" and in favor of Mr. Autrey with respect to the single assessment against him under section 6700 and the assessments against him under section 6701 and section 6694.

**1.** This case is governed by the Internal Revenue Code of 1954, as amended. All references will be to the Code of 1954 unless otherwise indicated.

The government appeals, claiming that the district court's instructions to the jury regarding section 6700 were erroneous, and that this error also caused the instructions regarding sections 6701 and 6694 to be erroneous. Mr. Autrey and the corporate plaintiffs contest these assertions and cross-appeal the district court's finding that it lacked jurisdiction to hear Mr. Autrey's claim for refund with respect to the four "duplicate assessments". The plaintiffs also cross-appeal the district court's denial of their motion for litigation costs under section 7430.

## II. The Government's Appeal

### A. Introduction

Section 6700 prohibits persons who organize, assist in the organization of, or participate in the sale of any interest in an investment plan from making two types of statements in connection with those activities. One such statement, generally referred to as a "gross valuation overstatement", is a statement regarding the value of any property that exceeds 200% of the correct valuation when the value of the property is directly related to the amount of any deduction or credit allowable under the tax laws. I.R.C. § 6700(a)(2)(B). The other type of statement, referred to by the majority as a "false representation", is a statement with respect to the allowability of any deduction or credit, the excludability of income or the securing of any tax benefit by reason of holding an interest in the entity or participating in the plan, which the person knows or has reason to know is false or fraudulent. I.R.C. § 6700(a)(2)(A). In the present case the government presented evidence relevant to proving that Mr. Autrey and the corporate plaintiffs had made both types of statements. A jury finding that Mr. Autrey and the corporate plaintiffs had made either type of statement would have been sufficient to uphold the IRS assessments under section 6700.

In its analysis of the district court's jury instruction regarding how the jury was to determine whether the plaintiffs had made a gross valuation overstatement with respect to the cattle breeding investments, the majority concludes that the jury should have been instructed to consider only the value of the cattle because the other aspects of the investment plan do not, as a matter of law, add value to the investment. I cannot agree with this conclusion because it is legally incorrect and ignores the economic substance of the transactions. With respect to the alternate theory of liability under section 6700, the making of a "false representation", I agree with the majority's conclusion that the tax laws do not allow the value of intangible portions of the investment to be "bundled" with the value of the cattle for the purposes of calculating Accelerated Cost Recovery ("ACRS") and the Investment Tax Credit ("ITC"). The majority holds that this issue must be retried, without analyzing the instruction given by the district court or the instructions tendered by the government which the district court rejected. Because I find the government's proffered instructions to have been grossly erroneous, and the instructions given by the district court to have sufficiently described the law so as to preclude manifest injustice, I dissent from the majority's decision to remand this issue.

Sections 6701 and 6694 impose penalties on tax return preparers who prepare a return knowing that it understates the tax liability of the taxpayer, I.R.C. § 6701, or whose negligent or intentional disregard of IRS rules and regulations results in an understatement of tax liability, I.R.C. § 6694. The government presented evidence relevant to proving that Mr. Autrey had assisted in the preparation of portions of many investors' returns related to the cattle breeding programs, and that those returns understated the tax liability of the investors. Reasoning that the court's instructions to the jury regarding liability under section 6700 for making false representations necessarily misled the jury as to Mr. Autrey's potential for liability as a tax return preparer under sections 6701 and 6694, the majority also remands this issue to be re-tried. I agree that the determinations of liability under section 6700 and sections 6701 and 6694 are necessarily related. As a result, because I find the in-

structions relating to section 6700 proffered by the government to have been grossly erroneous, and because the district court gave instructions relating to sections 6700, 6701 and 6694 that adequately explained the law, I must dissent from the majority's decision to remand the issues of Mr. Autrey's liability under sections 6701 and 6694.

### B. "Gross Valuation Overstatements"

Section 6700(a)(2)(B) imposes a penalty on persons who organize, assist in the organization of, or participate in the sale of any interest in any investment plan who make any statement as to the value of property or services if (A) the value so stated exceeds 200 percent of the amount determined to be the correct valuation, and (B) the value of such property or services is directly related to the amount of any deduction or credit allowable under chapter 1 to any participant. The government argues that the district court's instruction to the jury on this code section was erroneous because it directed the jury to determine whether the value of the "investment unit" had been overstated by more than 200 percent, rather than directing the jury to consider only the value of the cows. The government contends that Mr. Autrey and the corporate plaintiffs represented to investors that the cows alone were worth $100,000, and thus the determination of whether a gross valuation overstatement was made depends only on the actual value of the cows. On the other hand, the plaintiffs contend that the investment included not only the cows, but rights under the Cattle Breeding Agreement and the Calf Option Agreement (the "Agreements"). Some of these rights include the right to a five-year supply of bull semen, management services and the right to have fertile cows substituted for infertile cows.

In support of its position, the government points to the bill of sale, which indicates that in return for $100,000 the investor received "all right, title and interest" in a herd of six cows. This argument, which the majority adopts, improperly ignores the reality of the underlying transaction.

*Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935) (Establishing that the economic substance of transactions, rather than their form, is controlling for federal tax purposes.)

The Bill of Sale is only one of several documents involved in these transactions. The Private Placement Memorandum summarizes the provisions of the Agreements that each investor entered into simultaneously with the transfer of title to each herd of six cows. The Summary of the Offering in the Private Placement Memorandum describes the securities being offered as "[a] Breeding Herd consisting of 6 cows or heifers, which include management contracts for the maintenance of the cattle...." Plaintiffs' Exh. 123, R.O.A. Vol. 4, Tab 43. The Summary goes on to explain that "[t]he Investors will enter into a cattle breeding program where the Issuer will manage the purchased cattle, the substitute cattle and the offsprings. The cattle breeding program is commenced by an Investor executing a Cattle Breeding Agreement, a Calf Option Agreement and a Full Recourse Promissory Note with the Issuer." *Id.* Samples of the Agreements were attached to each Private Placement Memorandum.

In holding that the jury should have been instructed to consider only the fair market value of the cattle in determining whether the plaintiffs had made a gross valuation overstatement, the majority reasons that, as a matter of law, the rights each Investor had under the Agreements do not add value to the investment. This holding directly contradicts well established precedent that determinations of value are a matter of fact to be decided by the jury. *Laird v. United States*, 556 F.2d 1224, 1239 (5th Cir.1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978) ("[T]he valuation of assets is a factual finding...."); *Anderson v. Commissioner*, 250 F.2d 242, 249 (5th Cir.1957), *cert. denied*, 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 844 (1958); *Silverman v. Commissioner*, 538 F.2d 927, 931 (2d Cir.1976). The majority cites two Tax Court cases, *Houchins v. Commissioner*, 79 T.C. 570 (1982) and *Grodt & McKay Realty, Inc. v. Commis-*

*sioner,* 77 T.C. 1221 (1981), in support of the proposition that as a matter of law "a valueless intangible contract right can add no value to an associated [investment in a herd of breeding cattle]." At 981.

The holdings in *Grodt* and *Houchins* do not support this proposition for two reasons. First, the majority's analysis of these cases ignores the fact that the Tax Court sits as the trier of both law and fact. The Tax Court does not state in either case that its findings regarding the value of the agreements in those cases was a finding of law. Instead, in *Houchins* the Tax Court explains its decision regarding the value of the agreements by commenting on the lack of persuasiveness and credibility of the plaintiff's expert witness. 79 T.C. at 592. Moreover, in both cases the Tax Court states that it cannot place a value on certain agreements because the plaintiffs failed to make any attempt to value the agreements individually as components of the investment unit. *Houchins,* 79 T.C. at 592; *Grodt,* 77 T.C. at 1239 n. 20. Unlike the plaintiffs in *Houchins* and *Grodt,* the plaintiffs in this case did present evidence regarding the value of the five year supply of bull semen (approx. $21,000), R.O.A. Vol. 11, p. 54, Vol. 12, p. 164, Vol. 13, p. 194, 221, Vol. 14, p. 78–82, 227, and the value of the right to have fertile cows substituted for infertile cows (approx. $10,000), R.O.A. Vol. 11, p. 54.

Secondly, in both cases the Tax Court was analyzing cattle breeding programs to determine whether the investors were purchasers in bona fide arm's length sale transactions. In deciding whether true sales had taken place, the Tax Court looked to see whether the fair market value of the cattle was approximately equal to the purchase price. Like Mr. Autrey and the corporations, the taxpayers in both cases argued that the purchase price they paid included more than the fair market value of the cattle. Specifically, they argued that the investment included the value of certain warranties and transportation expenses in addition to the value of the cattle. The Tax Court reasoned that because the evidence showed it was standard practice in the industry to offer these warranties to purchasers of cows, and for brokers not to charge transportation costs to the purchaser, the value of these warranties and transportation costs was already included in the market price. Therefore, the Tax Court concluded, these warranties and pre-paid expenses added nothing to the established market value, which the Tax Court found to be substantially below the price paid by the taxpayers. *Houchins,* 79 T.C. at 593; *Grodt,* 77 T.C. at 1239. This conclusion, however, does not mean that the Tax Court found the warranties and pre-paid expenses to be *valueless* as a matter of law. Instead, the Tax Court found that the evidence showed that the value of these items was already included in the market price of the cattle, and therefore did not represent value in addition to the fair market value of the cattle.

Neither the majority nor the government rely on evidence that the value of a five year supply of bull semen, the right of substitution, and other intangible contract rights are customarily included in the purchase of breeding Brangus cattle such that their value is already factored into the market price of the cattle. Instead, the majority and the government argue that because the Investors were obligated under the Agreements to pay for bull semen and costs of insemination if the Investor elected to keep a calf instead of selling it to the Rancher, the right to bull semen and artificial insemination cannot be seen as part of the original $100,000 investment. Similarly, the majority and the government argue that the right of cow substitution only protects the Rancher, who is obligated to buy a "crop" of calves for $25,000, no matter how many calves are in the "crop", and therefore the substitution rights offer no value to the Investor. The majority and the government also argue that because an Investor was obligated to pay for other intangible rights such as maintenance and care of the cattle and other management expenses such as accounting fees, these intangible rights add no value to the fair market value of the cattle.

However, the plaintiffs offered evidence tending to show that an Investor's right to

have cows inseminated over a five year period is worth more than the costs of artificial insemination and bull semen which an Investor would have to pay *if* he decided to keep the calves. First, the evidence shows that under the Calf Option Agreement an Investor could sell one year's crop of calves to the Ranch for $25,000, regardless of the number of calves in the crop, and there was no setoff for costs of bull semen and artificial insemination. From this evidence a reasonable jury could conclude that this right would be valuable to an Investor in a year in which his calf crop consisted of only one or two calves, as he would probably receive at least market value for the calves without having incurred the expense of bull semen and artificial insemination. Secondly, the evidence shows that at the end of five years the Investor would be free to sell the herd of six breeding cows. Mr. Autrey and others testified that cows that are proven breeders command higher prices than unproven breeders. From this evidence, the jury could reasonably conclude that an Investor's right to a five year supply of bull semen used in a regular program of artificial insemination added value to the investment beyond the costs of the semen and artificial insemination procedures because, over a period of years, cows that are successfully bred on a regular basis will be more valuable than cows that are not proven breeders.

Similarly, the plaintiffs offered evidence that the right to have infertile cows replaced with fertile cows is valuable not only to the Rancher, as the majority points out, but also to the Investor. The evidence shows that cows are capable of breeding for a limited number of years, and that the older a cow is, the harder she is to breed. Under the Cattle Breeding Agreement, the Rancher had the right to substitute cows which were difficult breeders for more fertile cows. One witness testified that the Rancher would be motivated to substitute fertile cows because the Rancher would want to be able to buy as many calves as possible for the $25,000 purchase price agreed on in the Calf Option Agreement. This same witness noted, however, that the substitution was also valuable for the Investor because at the end of the breeding program the Investor would have a relatively young and fertile group of cattle to sell. A reasonable jury could conclude that in light of the evidence that fertile cows are more valuable than non-fertile cows, an Investor who owned six relatively young and fertile cows, whose prospects for breeding over several years were good, would be likely to get a better price for them than an Investor who owned a group of older, and perhaps not all fertile cows.

In its discussion of the "other intangibles", the majority focuses on the testimony of Mr. Autrey that the maintenance and care of the cattle was a part of the investment. The majority correctly notes that these services were paid for separately by the $1,000 per year per cow maintenance fee. However, the record contains evidence regarding other benefits received by the Investors that are not included in the maintenance fee. For example, the Ranchers had the right to enter the Investors' cattle in cattle shows. The plaintiffs introduced evidence that the Ranchers entered the cattle in shows and the cattle won numerous awards. Although the government made light of these awards at trial, there was evidence tending to show that these awards would do more for the Investors than inflate their pride as cattle owners.

Several witnesses testified that the two most important qualities in valuing breeding cattle are pedigree and productivity (fertility). There was testimony to the effect that cows known to have a high quality ancestry command higher prices, and the way in which certain pedigrees become famous is by cattle being entered in shows and winning awards. Breeders pay attention to the pedigree of cows that win awards, and look for that pedigree when buying breeding cattle. Based on this evidence, a reasonable jury could conclude that having the cattle involved in a high quality breeding program which was developing a good reputation in the breeding community through winning awards at cattle shows added value to the investment in

addition to the fair market value of the cattle.

Furthermore, the fact that the Investors were obligated to pay for many of the services under the Agreements does not necessarily mean that the Investors interests in the contracts had no independent value. In *Laird v. United States*, 556 F.2d at 1224, the former Fifth Circuit allocated $3 million of the $7.5 million purchase price to the player contracts purchased by Atlanta Falcons owner Rankin Smith, Sr. in connection with his purchase of the NFL franchise. The court found that the contracts were "independent and uniquely valuable assets to the taxpayer." *Id.* at 1233. Rankin Smith's obligation under the contracts to pay the players for their services did not render the rights that Mr. Smith had under those contracts valueless. Similarly, the jury was entitled to find that the rights the Investors enjoyed to continued maintenance and veterinary care of their herd of six cattle were uniquely valuable assets independent of the Investors' obligations to pay set fees for those services over the five year period.

The district court's instruction directing the jury to consider the value of the investment unit was therefore not an erroneous statement of the law. In answering special interrogatories number one and two the jury found that Mr. Autrey and the corporate plaintiffs had not overstated the value of the cattle investment program by more than 200 percent. I would affirm the jury's verdict on this issue, as there was ample evidence in the record to support the verdict.

### C. "False Representations"

Section 6700 also imposes a penalty on persons who organize, assist in the organization of, or participate in the sale of any investment plan and who make a statement with respect to the allowability of any deduction or credit by reason of participating in the plan which the person knows or has reason to know is false or fraudulent as to any material matter. I.R.C. § 6700(a)(2)(A). The government argues that the district court's instruction to the jury on this code section was erroneous because it directed the jury to consider whether the plaintiffs had knowingly made a false statement regarding the deductibility of the investment unit, rather than directing the jury to consider only the deductibility of the cattle. The government argues that because only tangible property is subject to ACRS and the ITC, the jury should have been instructed that if the $100,000 amount represented by the plaintiffs to be fully subject to ACRS and the ITC represented an amount which the plaintiffs knew to be greater than the value of the cattle, the jury should find the plaintiffs guilty of violating section 6700.

The plaintiffs argue that under the rationale of *Texas Instruments, Inc. v. United States*, 551 F.2d 599 (5th Cir.1977), the value of the Cattle Breeding Agreement and the Calf Option Agreement may be "bundled" with the value of the cows, thereby making the full $100,000 investment subject to ACRS and the ITC. In *Texas Instruments* the court held that because the value of seismic data is entirely dependent on the existence of the tapes and film upon which it is recorded, the cost of collecting the data is properly included with the cost of the blank tapes and film when calculating the basis of the tapes and films for the purposes of the ITC and depreciation under section 167. *Id.* at 611. The plaintiffs argue that the value of the Agreements is similarly entirely dependent on the ownership of the herd of six cows, and therefore the value of the Agreements may be bundled with the value of the cows when calculating a basis for the purposes of ACRS.

I agree with the majority that the *Texas Instruments* rationale is inapplicable to the present case. The Agreements, unlike seismic data, do have an independent existence from the cows, the tangible property to which they relate. If an Investor did not own cows, but did enter into the Agreements, the Investor could assign the Agreements to someone else. The fact that the Agreements have no independent value to an Investor who does not own cows is immaterial. The holding of *Texas Instruments* is that because seismic data does not

exist if it is not recorded on tape or film, seismic data is properly considered tangible property and the cost of collecting the data can be included in the basis of seismic data tapes. In contrast, the Agreements do have an existence independent of that of the cows.

The court's analysis of the purchase of an NFL franchise in *Laird* is instructive. The court found that the taxpayer had properly allocated $50,000 of the $7.5 million purchase price to the non-depreciable franchise fee. The court also agreed with the taxpayer that the value of the player contracts should be treated as separate and distinct from the non-depreciable franchise fee, and allocated $3 million to the contracts to be subject to depreciation according to Treasury Reg. § 1.167. *Laird v. United States*, 556 F.2d at 1224. The Agreements entered into by the Investors are analogous to the player contracts purchased by the taxpayer in *Laird* and are properly considered to be separate and distinct from the Investors' interest in the cows.

Although Treasury Reg. § 1.167 allows a taxpayer to depreciate or amortize intangible assets with a useful life that can be estimated with reasonable accuracy, it allows the use of the methods prescribed in section 167, not section 168, the section containing the ACRS method represented by the plaintiffs as being the method under which investors could claim depreciation deductions. In fact, the legislative history of the ACRS states that intangible depreciable property is not "eligible property" under ACRS. General Explanation of the Economic Recovery Tax Act of 1981, Dec. 29, 1981 [Joint Committee Print] H.R. 4242, JCS–71–81 (LEXIS, Fedtax library, Legis file).

Intangible depreciable property is also not eligible for the ITC. As the majority

correctly states, the code describes property eligible for the ITC as certain *tangible* property. I.R.C. §§ 38, 46. *See also* Rev. Rul. 71–137, 1971–1 C.B. 104 (IRS finds player contracts depreciable assets under section 167, but disallows ITC because contracts are intangibles). The plaintiffs rely on their analysis of *Texas Instruments* in arguing that the Agreements can be "bundled" with the tangible cows, thereby becoming eligible for the ITC. This argument is not any more persuasive in the context of the ITC than it was in the context of the ACRS.

Having determined that a statement that the value of the intangible aspects of the cattle breeding programs may be included with the value of the cattle when calculating ACRS and ITC is a "false representation" under section 6700, the majority abruptly concludes its analysis of the appeal on this issue and orders a remand without analyzing the instructions given by the district court or the instructions requested by the government.[2] Even if the district court's instructions do not contain completely accurate statements of the law, the government is not entitled to an automatic remand. In *Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 750 F.2d 1516, 1525 (11th Cir.1985), this court held that "[i]f a requested instruction is refused and is not adequately covered by another instruction, the court will first inquire as to whether the requested instruction is a correct statement of the law. If [it is], the court will next look to see whether it deals with an issue which is properly before the jury. In the event both these standards are met, there still must be a showing of prejudicial harm as a result of the instruction not being given before the judgment will be disturbed." (citations omitted)

The government's requested jury charge number 8 stated:

2. In its instructions to the district court on remand, the majority states that the jury must first determine whether the plaintiffs represented that the $100,000 investment included the value of the intangible contract rights in addition to the value of the cows. As discussed above, a finding that the plaintiffs represented that the $100,000 investment price represented

only the value of the cows would ignore the economic reality of the transactions. Each investor clearly bought more than six cows. Therefore, I disagree with the majority's instruction that the jury must first determine whether the $100,000 amount was represented as being solely based on the value of the cattle.

[Y]ou may find a plaintiff liable for making a false or fraudulent statement if you find that the plaintiff made or furnished to investors statements, in the offering materials or otherwise, that tax benefits such as investment tax credits and depreciation deductions could properly be calculated using the $100,000 figure as the cost or value of an investment unit, when the plaintiff knew or had reason to know that the statement was false or fraudulent because the cost or value of the cattle in an investment unit was not equal to $100,000.

The government's requested instruction number 19, which was not considered by the district court because it was not timely filed under local rules, stated:

[I]f you find, for example, that the cattle in a given investment unit had a cost or value when the bill of sale was issued to the investor of an amount substantially less than $100,000, you must find that the plaintiffs knew or should have known that their statements as to the tax benefits available to investors on the basis of a $100,000 price per unit were false and fraudulent.

Both of these instructions are grossly erroneous because they direct the jury to find the plaintiffs liable if they knew the value of the cattle was less than $100,000. To be found liable for making a false representation under section 6700, however, the jury must find that the plaintiffs knew or should have known not only that the cattle were worth substantially less than $100,000, but also that the tax laws do not allow the value of the intangible portions of the program to be "bundled" with the value of the cattle for the purposes of calculating ACRS and the ITC.

The instructions proffered by the government would have essentially directed a verdict against the plaintiffs, because Mr. Autrey himself testified that he thought the six cattle in a unit were worth approximately $60,000 and that the right to a five year supply of bull semen, the cattle substitution rights and other intangible aspects of the program made an entire investment unit worth $100,000. Based on the government's proffered instructions, the jury could have found Mr. Autrey liable without considering whether he knew or should have known that the value of the intangible aspects of the program could not be included when calculating ACRS and the ITC. Mr. Autrey testified that he believed, based on his knowledge and research of the tax laws, that even if the cattle alone were not worth $100,000, the value of the intangibles could be included in calculating ACRS and the ITC. A proper instruction would have directed the jury to evaluate the credibility of this testimony before finding Mr. Autrey liable for making a false representation in violation of section 6700.

The government argues on appeal that the district court committed reversible error because its instructions did not clearly present the issue of whether Mr. Autrey knew or should have known that his "bundling" theory was not supported by the tax law. I agree that the court's instructions on this issue were not complete. However, the instructions proffered by the government also did not properly present this issue. Furthermore, at the charge conference the government's objections to the charges given by the court focused on the government's theory that the evidence showed that the plaintiffs represented that the cattle alone were worth $100,000, and that they knew this was false. The district court correctly rejected this theory, and the government did not explain that the court's instructions failed to inform the jury that even if it found that the value of an investment unit was $100,000, the plaintiffs could be liable for violating section 6700 if they knew or had reason to know that the value of the intangibles could not be included in calculating ACRS and the ITC.

Under these circumstances, a reversal is authorized only if the district court committed plain error. *Bissett v. Ply–Gem Industries, Inc.*, 533 F.2d 142 (5th Cir.1976). In *Bissett*, the jury instruction requested by the defendant would have informed the jury that Florida law did not allow the plaintiff to recover for fraud if the defendant's statements were promises rather than statements of existing facts. The former Fifth Circuit found that this instruc-

tion was grossly erroneous because it would deny recovery regardless of the promisor's intent, and under Florida law promissory statements are actionable if the promisor had a positive intent not to perform the promise at the time it was made. Although the court found the instruction given by the district court to have been incomplete, because the instruction requested by the defendant at trial was grossly erroneous, the court denied the appeal because it found no plain error or manifest injustice. *Id.*

In determining whether incorrect jury instructions resulted in a manifest injustice, this court takes into account the instructions in their entirety, the evidence presented, and the arguments of counsel to determine whether the jury was substantially misled and whether they understood the issues. *See Iervolino v. Delta Air Lines, Inc.,* 796 F.2d 1408 (11th Cir.1986), *cert. denied,* 479 U.S. 1090, 107 S.Ct. 1300, 94 L.Ed.2d 155 (1987); *Somer v. Johnson,* 704 F.2d 1473 (11th Cir.1983); *Bissett,* 533 F.2d at 142. The district court instructed the jury that it could find a plaintiff liable if it found that the plaintiff "made a representation to an investor with respect to the allowability of a tax deduction or credit, by reason of participating in the investment plan, that the plaintiffs knew or had reason to know was false or fraudulent as to a material matter." R.O.A. Vol. 20, p. 157. Following this global instruction, the court gave some specific examples of the potential for liability, none of which included an example explaining the potential for liability with respect to Mr. Autrey's "bundling" theory. At trial, Mr. Autrey testified regarding his belief that the "bundling" theory was valid, and on cross-examination the government attacked that theory. The issue of Mr. Autrey's knowledge of the tax laws was argued to the jury. In closing argument, the plaintiffs stated: "We believe that the investors had the right to take the ITC credits and the depreciation. The status of the law in '82 and '83 authorized it. Bob Autrey researched it thoroughly and he seriously and sincerely believed it." R.O.A. Vol. 20, p. 90–91. The government argued: "[There are] only two

real questions to be decided by you in this case. One concerns the value of the property being sold. Depreciation and Investment Tax Credit can only be taken on a tangible personal property. Mr. Autrey's attempts to retrospectively categorize other items of the breeding programs as tangible personal property has been refuted." R.O.A. Vol. 20, p. 126. The jury was made aware of the dispute over the "bundling" theory, and was instructed that it could find Mr. Autrey liable for making statements regarding deductibility that he knew or had reason to know were false or fraudulent. Under these circumstances, I find the members of the jury were sufficiently instructed so as to preclude any "substantial and ineradicable doubt as to whether [they] were properly guided in [their] deliberations." *Somer v. Johnson,* 704 F.2d at 1478. I therefore dissent from the majority's decision to vacate the jury's verdict and remand this issue to be retried.

### D. Sections 6701 and 6694

I agree with the majority that the jury's determination of liability under section 6701 and section 6694 was necessarily related to its determination under section 6700. Section 6701 imposes a penalty on any person who assists in the preparation of a tax return and who knows that the return understates the tax liability of the taxpayer. Section 6694 imposes a penalty on an income tax return preparer whose negligent or intentional disregard of IRS rules and regulations results in the understatement of the tax liability of the taxpayer. The jury found that Mr. Autrey assisted in the preparation of portions of 303 tax returns related to the investment programs. The court instructed that the jury must find Mr. Autrey liable under section 6701 if it found that he knew that the value of the investment unit was less than $100,000, and that Mr. Autrey would be liable under section 6694 if he negligently or intentionally disregarded an IRS rule or regulation. As noted above, the district court's instruction did not explicitly provide for the potential for liability if Mr. Autrey knew or had reason to know that the full

$100,000, although a correct valuation of the investment unit, was not subject to ACRS or the ITC.

The reasons for my disagreement with the majority's abrupt decision to remand the issue of liability for making a false representation in violation of section 6700 apply with equal force to the issue of Mr. Autrey's liability under sections 6701 and 6694. As explained above, the instructions requested by the government with respect to section 6700 liability that also relate to liability under sections 6701 and 6694 were grossly erroneous. From the testimony and cross-examination of Mr. Autrey, and the closing arguments of both parties, the jury was aware of the dispute regarding Mr. Autrey's "bundling" theory, and the district court gave global instructions on both sections 6701 and 6694, explaining that Mr. Autrey could be liable if he knew that his calculations on the tax returns understated the tax liability of the taxpayers, or if he negligently or intentionally disregarded any IRS rule or regulation. Furthermore, the government failed to object to any of the instructions directly related to liability under sections 6701 and 6694. Under these circumstances, I do not find that the district court committed a plain error resulting in manifest injustice, and I dissent from the majority's decision to vacate the jury's verdict and remand these issues to be re-tried.

**3.** The government had made this same argument in its answer to the complaint and again in a motion to amend the pleadings to assert a counterclaim against Mr. Autrey individually for the aggregate amount of the "duplicate assessments" against the four corporations. In that motion the government maintained that if the court did not allow the amendment, the court would lack jurisdiction over Mr. Autrey because he had not made a separate 15% prepayment. The district court denied the motion on the grounds that the government had delayed too long in filing the motion. Although the government knew in November, 1985 that it wanted to file the counterclaim, it waited until December, 1986, only one month before the trial was scheduled to start, to file its motion to amend the pleadings.

**4.** As the government points out in its brief, the language of section 6700 clearly states that any person can be liable, and corporations come

## III. The Plaintiffs' Cross–Appeal

### A. Jurisdiction

After the jury returned its verdict in favor of Mr. Autrey and the corporate plaintiffs, the government renewed its argument that the district court lacked jurisdiction over Mr. Autrey's claims for refund related to the four "duplicate assessments" because only one 15% prepayment had been made for each "duplicate assessment" and those payments had been credited to the corporations.[3] The majority's conclusion that the district court correctly held that it was without jurisdiction to decide Mr. Autrey's claim for a refund assumes, without explanation, that the "duplicate assessments" were in fact two separate assessments. At 988–989. Yet, as the government states in its brief, the real question raised by the plaintiffs' cross-appeal is whether the IRS, in fact, made two assessments or only one. This question deserves more consideration than the unexplained, unsupported assumption made by the majority.

The government admits in its brief that the evidence relevant to this issue is not "crystal clear" and that the "duplicate assessment" language on the notices sent to the plaintiffs "lends a note of ambiguity" to those notices. I agree with the majority that the government is entitled to assess penalties against both Mr. Autrey and the corporate plaintiffs.[4] However, this means

within the definition of "person" under the tax code. I.R.C. §§ 6700, 7701(a)(1). Furthermore, in the context of granting injunctive relief under section 7408(b), courts have found that corporations which have engaged in conduct subject to penalty under section 6700 are properly subject to injunctions. *United States v. Philatelic Leasing, Ltd.*, 794 F.2d 781 (2d Cir.1986). In *Philatelic Leasing* the defendants were Global International, Inc., which sold stamp masters to Hambrose Stamps, Ltd.; Hambrose Stamps, which sold them to Philatelic Leasing, Ltd.; and Philatelic Leasing, which offered them for lease to the public; and Melvin Hersch, the president of Philatelic Leasing. The court upheld the district courts injunction against Hersch and all the corporate defendants based on evidence that all defendants had engaged in conduct subject to penalty under section 6700. *Id.* at 787. Therefore, because there was evidence that the corporations participated in the sale of interests in the tax shelters by issuing the Private Place-

that when reviewing tax shelters for possible violations, the IRS is faced with a choice as to which promoters it will pursue. In this case the IRS sent assessment letters to the plaintiffs which the government admits were ambiguous. Autrey attempted to resolve the ambiguity when he contacted the IRS and asked the agent whether the "duplicate assessments" required one 15% payment or two.[5]

The "duplicate assessments" made in this case contain a latent defect that neither party has discussed. Each "duplicate assessment" relating to the four corporate plaintiffs indicated the same penalty amount for both Mr. Autrey and the individual corporation. For example, for activities relating to Star Brangus Ranch, Inc., the assessment notices sent to Mr. Autrey and to Star Brangus both indicated a penalty amount of $139,489. The government argues that this "duplicate assessment" means that Mr. Autrey and Star Brangus each owe the IRS $139,489, for a total of $278,978. Although both Mr. Autrey and the corporations can be penalized under section 6700, based on the evidence presented at trial I am unable to agree with the government's position that section 6700 entitles the IRS to collect the same amount from Mr. Autrey as from each of the corporate plaintiffs.

The version of section 6700 in effect when the "duplicate assessments" were made allowed the IRS to assess against a person who violated section 6700 a penalty "equal to the greater of $1,000 or 10 percent of the *gross income derived by such person* from such activity." Each of the duplicate assessment letters was accompanied by a copy of Revenue Agent Craig Smith's report in which he calculated the appropriate penalties. A table attached to the report shows that Agent Smith calculated the penalties by subtracting from the cash received by each corporate plaintiff

the cost of the cows sold to the investors, and then calculating 10 percent of that gross income amount. The government introduced no evidence of any separate calculation having been made with regard to the income derived individually by Mr. Autrey. Although Mr. Autrey owned 100% of the stock of three of the corporate plaintiffs and 50% of the stock of the fourth, the gross income he derived from the activities of the four corporations would not necessarily be equal to the corporations' gross income. Mr. Autrey's gross income from the corporations' activities would be equal to the dividends he received as a shareholder. The record does not reveal the amount of dividends paid by the four corporations in the relevant years, but common sense dictates that a corporation would not pay out its entire gross income in dividends.

The plain language of the statute does not allow the IRS to assess penalties against Mr. Autrey based on the gross income derived by the corporations. Instead, the IRS may assess penalties against the corporations based on their gross income from the investments, and separate penalties against Mr. Autrey based on his gross income derived from his involvement in the investment plans. Of course, any liability of Mr. Autrey does not arise from his status as a shareholder, but from his personal involvement in the organization and promotion of the investments.

Mr. Autrey has consistently maintained that the IRS has only made one assessment for the activities of each of the four corporations, and thus does not challenge on appeal the amount of the assessment that the government claims has been made against him individually. Nevertheless, the issue of the amount of the penalties allegedly assessed against Mr. Autrey must be addressed, as it relates to the ambiguous nature of the notices sent to the

---

ment Memoranda, the corporations can be held liable if they are found to have violated section 6700.

**5.** This question in itself indicates that Mr. Autrey understands that he cannot challenge the validity of an assessment without meeting the jurisdictional prerequisite. It was an attempt

by Mr. Autrey to ascertain whether the IRS intended to pursue him and the corporations separately, or together and implies that he knew that both the corporations and he would have to pay a separate 15% penalty if the IRS intended to make multiple assessments based on the activities relating to each of the four ranches.

plaintiffs. The fact that the calculation of the penalties that accompanied each "duplicate assessment" sent to Mr. Autrey in his individual capacity bears no relation to gross income received by Mr. Autrey from his involvement in organizing and promoting the investment programs adds to the ambiguity of those notices. Because the statute clearly states that penalties are to be assessed based on the gross income derived by each person, and the penalty calculations related only to the gross income of the corporate plaintiffs, Mr. Autrey understandably thought that the "duplicate assessments" were joint assessments against himself and each corporate plaintiff.

The statement by the IRS agent that only one 15% payment would be necessary constituted a choice by the IRS that the "duplicate assessments" would constitute four joint assessments against Mr. Autrey and each corporation with respect to the activities of the four corporations. Contrary to the assertions of the government, which the majority apparently accepts, this is not a case of a government agent making an incorrect statement of law which cannot bind the government. The "duplicate assessment" language on the notices received by the plaintiffs was ambiguous, and the government points to no law that supports the assertion that "duplicate assessment" means two separate assessments as opposed to one assessment against two parties. In fact, under the circumstances of this case, because the penalty calculations related only to the gross income of the corporations, the assertion that "duplicate assessment" means two separate assessments would be *contrary* to law, as it directly contradicts the plain language of the statute. The agent's statement that only one 15% payment

would be necessary for the plaintiffs to seek a refund was therefore a statement of *fact* that the "duplicate assessment" language meant that the IRS was seeking only one penalty with respect to the activities of each of the four corporate plaintiffs.[6]

Notice to all persons of assessments under section 6700 "must meet certain minimum requirements sufficient to impart [them] with fair notice." *Planned Investments, Inc. v. United States*, 881 F.2d 340, 342, *aff'g Houston v. United States*, 682 F.Supp. 340 (W.D.Mich.1988). "[N]otice must meet the general 'fairness' requirement of due process," although "notices containing technical defects are valid where the taxpayer has not been prejudiced or misled by the error. . . ." *Id.* at 344. In the context of this case, minimal fairness means that the IRS is obliged to make "crystal clear" whether it intends to pursue one penalty or two. The IRS agent's misstatement of the department's intentions clearly misled Mr. Autrey, and to bind Mr. Autrey to the government's current position that it intended to pursue two penalties would cause substantial prejudice to Mr. Autrey based on his detrimental reliance on the misstatement of fact by the IRS agent.

The answer to the real question posed by the plaintiffs' cross-appeal, therefore, is that only one assessment was made. Although the IRS may have originally intended to make two assessments for the activities of each of the four corporate plaintiffs, the ambiguous manner in which it notified the plaintiffs confused even the IRS's own agents. It clearly violates concepts of minimal fairness to require taxpayers to read

---

**6.** It may appear anomalous to conclude that the IRS may not calculate individual penalties under section 6700 against Mr. Autrey based on the gross income of the corporations, and to accept that Mr. Autrey may be jointly liable for a penalty based solely on the gross income of the corporations. Under the circumstances of this case, where Mr. Autrey is the sole shareholder of three of the corporations, and is a 50% shareholder of the fourth, joint liability nevertheless seems appropriate. The focus of

this case has always been on Mr. Autrey, because, as the government stated in closing arguments, he is the corporations. He created them, and he created and promoted the cattle breeding programs through them. The government is entitled to pierce this thin corporate veil by seeking a joint penalty. The use of the corporate form to create investment programs does not, however, entitle the government to seek double penalties.

the IRS's mind when the IRS itself doesn't know what it is thinking.

To avoid unfair prejudice to Mr. Autrey stemming from the ambiguous actions of the IRS, and to avoid finding that an assessment under section 6700 bearing no relation to the accused's gross income from the prohibited activity is a valid assessment, I would hold that the "duplicate assessments" issued by the IRS amount to a single assessment against the plaintiffs for which the jurisdictional prerequisite was satisfied by the checks tendered by Mr. Autrey.

The government also asserts that even if only one assessment was made, whether liability is joint or joint and several, all the plaintiffs are required to submit a 15% payment to satisfy the jurisdictional prerequisite. The government argues that its "substantial interest in protecting the public purse" justifies requiring both "persons" to make the 15% payment when the IRS makes a single "duplicate assessment" as it has in this case. Answering Brief of the United States as Cross–Appellee at 34, citing *Flora v. United States*, 362 U.S. 145, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960). While the legislative history of the tax code supports the government's argument that the 15% payment is intended to provide protection for the public purse, nothing in the history of section 6703 indicates that a 30% payment is necessary when one assessment is made against two persons. S.Rep. No. 494, 97th Cong., 2d Sess. 270–71, *reprinted in* 1982 U.S.Code Cong. & Admin. News 781, 1017–18 (1982). Under the government's interpretation, the assessment of penalties against a partnership consisting of ten partners would require the partners to collectively prepay 15% of the penalty, as it is the individual partners who would be liable for the penalty, not the partnership. Congress considered one 15% payment adequate to protect the government's interests in collecting one assessment. The existence of more than one person who is liable for that one assessment does not create a special need for additional 15% payments prior to the district court trial. In this case, one 15% payment was made for each "duplicate assessment". The district court therefore had jurisdiction to hear both Mr. Autrey's and the corporations' claims for a refund of each of the four assessments.

### B. Litigation Costs under Section 7430

Section 7430 authorizes the district court to award reasonable litigation costs to a party that "establishes that the position of the United States in [a civil proceeding to determine, collect or refund taxes under the Internal Revenue Code] was unreasonable." I.R.C. § 7430 (1982 & Supp. IV 1986). At trial the plaintiffs introduced evidence that the IRS attempted to persuade the first IRS agent who appraised the cattle involved in these programs to lower his appraisal. When the agent refused, the IRS destroyed the appraisal and commissioned others to do additional appraisals. The plaintiffs contend that the IRS was displeased with the agent's report because he appraised a herd of six cows at $49,800, a figure too close to 50% of the $100,000 investment price to prove that $100,000 amounted to a gross valuation overstatement of the value of the cattle. When Mr. Autrey asked the IRS about the appraisal done by the first agent, he was told that the appraisal had never been completed. It was not until eight days before trial that the IRS admitted to the existence of the first appraisal, and produced a copy of it at the plaintiffs' request.

The plaintiffs base their request for reasonable litigation costs on this highly questionable, pre-litigation conduct by officials of the IRS. This court recently rejected the argument that litigation costs may be awarded under section 7430 based on conduct of IRS agents prior to the commencement of litigation. *Ewing v. Heye*, 803 F.2d 613 (11th Cir.1986). The plaintiffs argue that *Ewing* should be reconsidered in light of a subsequent amendment to section 7430 that expressly allows for the award of costs based on administrative action or inaction upon which subsequent civil litigation is based. 26 U.S.C. § 7430(c)(4). Plaintiffs argue that this new version of section 7430 reveals that the legislature always intended for section 7430 to cover

pre-litigation conduct. This argument is not persuasive, as the amended version of section 7430 by its own terms applies only to proceedings commenced after December 31, 1985, thus indicating a *change* in the legislature's intent. Therefore, I agree with the majority that our holding in *Ewing* controls this case, but only because this case commenced prior to December 31, 1985.

For the foregoing reasons, I dissent, except as to the issue of litigation expenses.